FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA DEC -7 PM 3: 22
### NORTHEASTERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

EVOLYENE S. STORY,                    ]
                                      ]
    Plaintiff(s),                 ]
                                      ]
vs.                                   ]
                                      ]   CV 97-N-2254-NE
GENERAL MOTORS CORP., et al.,         ]
                                      ]
    Defendant(s).                 ]
                                      ]

ENTERED

DEC   7 1998

### Memorandum of Opinion

    The court has for consideration the defendant's motion for summary judgment, filed September 17, 1998. Both parties have been given an opportunity to brief the issues and the court heard oral argument on November 30, 1998. The motion is therefore properly before the court and ripe for decision. Upon due consideration, it will be granted in all respects. Plaintiff Evolyene Story ("Story") has sued General Motors Corporation ("GM"), alleging that GM has denied her employment in violation of the Americans with Disabilities Act, ("ADA"), 42 U.S.C. § 12101 *et seq.* Specifically, the plaintiff claims that she is a GM employee, that she was injured on the job and is disabled, and that there are several positions at GM she could fill despite her disability but GM has refused to allow her to work in those positions in violation of the ADA.

*30*

## I.    Statement of Facts.[1]

Viewed in the light most favorable to the plaintiff, the record before the court on summary judgment suggests the following version of events. The plaintiff, Evolyene Stafford Story, was hired as an hourly employee at GM's Limestone County site in 1985. Sometime in 1988 Ms. Story was exposed to noxious chemical fumes inside the GM plant. As a result of this exposure, Ms. Story was placed on disability leave in 1988.

The 1988 incident has apparently resulted in long-term problems for Ms. Story, including respiratory damage and some type of chemical allergy or supersensitivity. The plaintiff has been seen for these problems numerous times by a pulmonary specialist at Vanderbilt University Medical Center, Dr. James Snell. Dr. Snell repeatedly informed both Story and GM that she could work effectively, but only if she was "removed from the plant which has chemical fumes" and placed in a "filtered atmosphere" where the air is "clean and free of chemical fumes." *Plaintiff's Exhibits* 12, 15,17.

Under GM's collective bargaining agreement with its employees, GM has the responsibility to place Story in a position consistent with these requirements if possible. Paragraph 72 of the National Collective Bargaining Agreement between GM and the United Auto Workers provides the following:

> Employees who have been incapacitated at their regular work by injury or compensable occupational disease while employed by the Corporation, will be employed in other work on jobs that are operating in the

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, the parties' respective responses to those claims, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied, USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

> plant which they can do without regard to any seniority provisions of this Agreement, except that such employees may not displace employees with longer seniority, provided, however, that by written agreement between local Management and Shop Committee, such employees may be placed or retained on jobs they can do without regard to seniority rules. . . .

*Defendant's Exhibit D* ¶ 72. Pursuant to this provision, GM assigned Ms. Story to work on the plant's grounds crew and she returned to work in June of 1992. It appears, however, that local union representatives were not pleased with this arrangement. According to testimony from both GM and Story, the union claimed that her position on the grounds crew should be posted through normal channels so that it could be bid on according to the seniority rules. GM therefore moved Story to the fleet automobile program (also called the "car program"), where trouble with the union apparently arose again. Over the next several years, Story was moved from position to position, sometimes splitting her time between various jobs. Principally, she worked doing clerical, computer-oriented tasks.[2] According to her testimony, Story did this type of work for the fleet automotive program, the plant's fabrication shop, and the personnel office.

After several years of this type of work, GM reassigned the plaintiff to a production job in the plant in November of 1995. Story was sent to work in GM's new hose assembly department. In her new position, Story glued rubber clamps on hoses using Lock Tite 380, a potent adhesive. The downdraft filter system designed to disperse the vapors from the Lock Tite was not properly installed, so the employees in the hose department were

---

[2] After her injury in 1988, Story took some computer classes and developed "quite a bit of computer expertise." *Plaintiff's Exhibit 1 (March 12 Depo. of E. Story at 52).*

3

exposed to the Lock Tite fumes. Ms. Story became ill again due to this exposure, and was sent home in March of 1996. GM admits that at this point the job was "inconsistent" with her medical restrictions. *Movant's Initial Statement of Undisputed Facts* No. 18.

In June of 1996, GM again attempted to bring the plaintiff back to work, this time for a job on the loading dock. While GM's plant physician had cleared her for loading dock work, when she arrived at the dock she was assigned to work around chemicals inside the plant. She again became ill. Once the plant physician discovered the situation, Ms. Lowery was taken off this job as well.

In February of 1997, GM again tried to summon the plaintiff to return to work, this time for a position inside one of GM's plants. The plant's physician at the time, Dr. Rajappa Ekambaram, inspected the worksite offered to the plaintiff and determined that the environment there had a good ventilation system and would satisfy her needs. The plaintiff felt otherwise. GM agreed that Story could be evaluated again by Dr. Snell before reporting for work at her new position. Dr. Snell apparently believed that the job would be contrary to her medical restrictions, urging in a letter to Dr. Ekambaram that Story be given a job outside the plant proper. *Plaintiff's Exhibit* 19. Story was never ordered to work at the plant job and, despite requests by her attorney, has not been offered another position. Story has never sought employment outside of GM. She has, however, filed claims for disability benefits with GM's disability pension office and with the Social Security Administration. Pursuant to its collective bargaining agreement with the UAW, General Motors provides total and permanent disability retirement benefits for its employees. To be eligible for a disability pension, a GM employee must be "totally and permanently

4

disabled," meaning "wholly and permanently prevented from engaging in regular employment or occupation with the Corporation at the plant or plants where the employee has seniority." *Defendant's Exhibit O*, art II, § 3. The plaintiff applied for total disability pension benefits on February 13, 1998. *Defendant's Exhibit J*. On her application, plaintiff indicated that she became "totally disabled" so that she was "wholly unable to work" beginning on July 16, 1996.[3]  *Id.*  In support of her application, plaintiff submitted a "Statement of Employee's Physician," signed by Dr. Snell. He indicated that Story could work in "any [job] without chemical fume exposure." When asked "the approximate date on which gainful employment of any kind may be expected to be resumed" Dr. Snell replied that Story was "not able to work in the plant." *Id.*

On March 11, 1998, plaintiff signed an application for Social Security Disability benefits. *Defendant's Exhibit K*. The terms of GM's pension apparently required her to file such an application as a condition of receiving disability benefits. *Plaintiff's Exhibit 2 (August 4 Depo. of E. Story* at 90). On this application, plaintiff indicated that she "became unable to work because of my disabling condition on July 15, 1996." *Exhibit K*. Plaintiff also alleged that "I am still disabled." *Id.* The application also notes that plaintiff is aware of the seriousness of making false claims in a social security filing. *Id.*

The plaintiff's deposition testimony, however, demonstrates that Ms. Story knew that the certifications she made to obtain long term disability and social security benefits were

_____

[3] The language is not the plaintiff's, but instead is part of GM's pension application form.

untrue and that she made them to obtain benefits from General Motors that she knew she

was not entitled to receive.

> Q:   But you understand that you were applying for total and permanent
>       disability benefits?
>
> A:   I understand I had to.
>
> Q:   *Well, were you not totally and permanently disabled?*
>
> A:   *No.*
>
> . . .
>
> Q:   Well, in response to that question on what date were you first totally
>       disabled by this sickness so that you were wholly unable to work,
>       your answer was what?
>
> A:   That was when I was sent home from the job that I was doing.
>
> Q:   Your answer was what?
>
> A:   7/16/98. I begged not to be sent home that day, but yeah I was totally
>       and wholly - *they wouldn't find me a job, so I guess maybe, you*
>       *know.*

*Plaintiff's Exhibit 2 (August 4 Depo. of E. Story* at 88-89) (emphasis added). A later

exchange was even more specific.

> Q:   Is it your position in this lawsuit that you are totally and permanently
>       disabled?
>
> A:   No.
>
> Q:   So you don't agree that you are wholly unable to work; is that correct?
>
> A:   Yes. I don't agree with it.

*Id.* at 112-113. When asked why she nevertheless applied for total disability benefits, Story

explained "it's something you have to do if you want to keep getting a check." *Id.* at 87.

6

GM approved Story's application for total and permanent disability benefits effective May 1, 1998. *Defendant's Exhibit J.* Neither party has presented evidence indicating whether any benefits have yet been paid and it is not clear from the record what became of Ms. Story's social security application.[4] However, as of August 26, 1997, Ms. Story had already filed a complaint in this court accusing GM of violations of the ADA. In her deposition in this action, taken August 4, 1998, and in her deposition from a previous suit against GM, taken March 12, 1996, Ms. Story has consistently contended that she in fact *could* work if placed in the appropriate job by GM and that she could do so without accommodation.

## II.    Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

---

[4] Story's counsel did represent to the court at oral argument that her client was receiving disability pension benefits but had been turned down for social security.

Where the nonmoving party will bear the burden of proof at trial, there is no requirement, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 323. "Instead, the moving party simply may '"show[ ]"--that is, point[ ] out to the district court--that there is an absence of evidence to support the nonmoving party's case.'" *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir.1991) (*en banc*) (quoting *Celotex*, 477 U.S. at 324); *see also Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (same); *Young v. City of Augusta*, 59 F.3d 1160, 1170 (11th Cir. 1995). However, "it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Clark v. Coats and Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party must instead make an "affirmative showing" that crucial evidence is missing "by reference to any combination of the following: pleadings; deposition testimony of a party or its witnesses; affidavits; responses to interrogatories . . . ; requests for admission . . . ; and any other exchanges between the parties that are in the record." *Cheatwood v. Roanoke Industries*, 891 F. Supp. 1528, 1533 (N.D. Ala. 1995) (Hancock, J.).

"Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial." *Four Parcels of Real Property*, 941 F.2d at 1437-38 (11th Cir.1991).

8

At this stage, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. *Id.* at 324. The nonmoving party must make a specific, affirmative showing that a genuine factual dispute exists. If the required showing is not made, "summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

After the plaintiff has responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to

9

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. Discussion.

The plaintiff's disability claims are governed by the familiar framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Weigel v. Target Stores*, 122 F.3d 461, 465 (7th Cir. 1997); *Grigsby v. Reynolds Metals Co.*, 821 F.2d

10

590, 594 (11th Cir. 1987). To prevail Story first must prove a *prima facie* case of discrimination. *Burdine*, 450 U.S. 252-53; *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 721 (2d Cir. 1994), *cert. denied*, 115 S. Ct. 1095 (1995). Defendant directs its attack at this first stage of the process, claiming that Story cannot prove her prima facie case at trial.

In order to establish a prima facie case of employment discrimination under Title I of the ADA, the plaintiff must present evidence sufficient to justify a jury in finding: (1) the plaintiff has a disability under the ADA; (2) the plaintiff is a "qualified individual" under the ADA; and (3) the plaintiff was subjected to unlawful discrimination because of his disability by his employer. *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998); *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996). GM concedes the first and last elements of this test, at least for summary judgment purposes, but asserts that it is entitled to summary judgment because Story cannot prove that she is a "qualified individual."

In order to prove this second element of her prima facie case, Story must meet the ADA's definition of a "qualified individual." *Morisky*, 80 F.3d at 447. The statute defines a "qualified individual" with a disability as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1).

The concept of reasonable accommodation is crucial to the ADA's scheme. To qualify for a job, the plaintiff need not show that she is able to perform the primary functions of a job in the same manner as an employee who is not disabled. The plaintiff

11

can instead show that with reasonable adjustments in the way the job is done, reasonable accommodations, the plaintiff can perform the essential functions of the job despite her disability. Importantly, however, "the burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997). "[A]n ADA plaintiff (1) as part of her burden of production, must identify an accommodation that would allow her to perform her job duties and (2) as a part of her burden of proving her case, must establish that such an accommodation is reasonable." *Willis v. Conopco, Inc.*, 108 F.3d 282, 284-86 (11th Cir. 1997).

The plaintiff is not, however, limited to the job she previously held in attempting to prove that she could satisfactorily fill a position with the defendant. "Reasonable accommodation may include but is not limited to: . . . (ii) . . . reassignment to a vacant position." 29 C.F.R. § 1630.2(o)(2). Thus the plaintiff may prove that she is a qualified individual by showing that, with or without accommodation, she is capable of performing a different job with the defendant, even though she cannot perform her former job. However, plaintiff is not allowed to pick just any job she fancies. "Reassignment to another position is a required accommodation only if there is a vacant position available for which the employee is otherwise qualified." *Willis*, 108 F.3d at 284; *see also Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1224-25 (11th Cir. 1997) (relying on same regulation and affirming district court for holding that transfer to a non-vacant position would not be a reasonable accommodation). Once again, plaintiff bears the burdens both of production and persuasion on the reasonable accommodation issue. In a case in which plaintiff seeks

12

a different job as an accommodation, she must establish the existence of an appropriate vacant position in order to make out a *prima facie* case. *See Willis*, 108 F.3d 286.

In this case, the evidence when viewed in plaintiff's favor establishes that there were positions at the GM site which plaintiff could fill, despite her medical problems. Story admits that she cannot work within the plant proper. However, Story worked for several years in a number of positions outside the plant with no difficulty.[5]  It appears that she could handle any office or clerical position based outside the main production area of the plant, and in fact could probably work in a number of other outside positions. Ms. Story claims that she "has requested to be placed in the yard crew, car program, fab shop, personnel department or working on computers," and would be fully capable of working in any of these positions. *Opponent's Initial Submission in Response to Exhibit "D" of the Court's Order*, at 35. It seems that she could, because she has.

GM does not really dispute Story's claims that she could perform these jobs, arguing instead that Story is nonetheless not qualified for two main reasons.[6] (1) Because Story previously represented that she was totally unable to work in applications for pension and social security benefits, she is now estopped from asserting that she is capable of working;

---

[5]As defendant points out, the fact that Story was temporarily assigned to these positions does not mean that a permanent slot in one of these jobs would necessarily be a reasonable accommodation. Job availability, seniority problems, and other issues might preclude a permanent assignment. However, her performance of these jobs *does* establish that she could do them without medical difficulty, if given the chance.

[6]The parties do disagree over Ms. Story's capacity to perform the actual tasks required of a member of the grounds crew. GM asserts, perhaps correctly, that she could not stand the mowing, weed-eating, and pesticide use performed by the grounds crew, and that she tolerated her stint at this position only because she was given special light duty, a situation which GM was not required to continue indefinitely. Even ignoring the grounds crew position, however, the other positions Story held apparently suited her and would provide possible openings she could fill for the company.

13

and (2) There are no openings in these positions which GM could transfer Story into

without violating the seniority provisions of its collective bargaining agreement with the

UAW. The court will address these contentions in turn.

## A.    Estoppel.

GM contends that Ms. Story's representations to GM and to the Social Security

Administration ("SSA") that she is incapable of working should estop her from asserting

before this court that she is capable of performing jobs at GM. Under the specific

circumstances of this case, this court agrees.

The question of whether a plaintiff who has sought disability benefits from the SSA,

state agencies, or private disability insurance carriers [7] should thereby be prohibited from

bringing an ADA claim is one which arises relatively frequently, and has sparked much

controversy. Courts have dealt with the problem in a wide variety of ways. *See, e.g.,*

---

[7] GM advances its arguments based on both the social security application and the pension application under the rubric of judicial estoppel. This may not be technically correct. Judicial estoppel is directed against "the calculated assertion of divergent sworn positions *in judicial proceedings.*" *Johnson Service Co. v. Transamerica Ins. Co.,* 485 F.2d 164, 175 (5th Cir. 1973). While judicial estoppel would cover the adjudicative process involved in a social security application, a private disability pension application does not involve dual judicial proceedings so judicial estoppel in the traditional sense may not apply. However a very similar, but more general, estoppel principle bars a "party with full knowledge of the facts, who accepts the benefits of a transaction, contract, statute, regulation, or order," from "subsequently tak[ing] an inconsistent position to avoid the corresponding obligations or effects." *DeShong v. Seaboard Coast Line R.R. Co.,* 737 F.2d 1520, 1522 (11th Cir. 1984). Under this or some similar principle, a number of courts have estopped claimants who applied for private long term disability pension benefits from altering the position taken in those applications in an ADA case. *Pena v. Houston Lighting and Power Co.,* 154 F.3d 267 (5th Cir. 1998) (applying estoppel to both an SSA application and a pension application); *Lewis v. Zilog, Inc.,* 908 F. Supp. 931 (N.D. Ga. 1995) (applying estoppel where plaintiff received private and governmental disability benefits), *aff'd without opinion,* 87 F.3d 1331 (11th Cir. 1996); *Allen v. Georgia Power Co.,* 980 F. Supp. 470 (N. D. Ga. 1997) (collecting cases). Whether this type of estoppel in considered "a form of equitable estoppel," though "lack[ing] the element of detrimental reliance," "a variation of judicial estoppel," or some entirely different animal altogether, *see DeShong,* 737 F.2d at 1522 n.5, it appears to apply quite neatly in the pension application/ADA context. A number of courts have in fact applied this "principle requiring consistency," *see id.,* in ADA cases, though few have distinguished it from true judicial estoppel. Fairness compels the court to stop a party from seeking or obtaining benefits under a disability plan, public or private, while making divergent statements in a lawsuit before this court under the ADA. This court concludes that this general principle of estoppel does apply in ADA cases, and that its application should be guided by the same principles applicable to judicial estoppel based on a social security application.

14

*Talavera v. School Board of Palm Beach Co.,* 129 F.3d 1214, 1220 (11th Cir. 1997) (reviewing the various approaches). Two principal trends appear in all of these decisions, however. First, most of the courts which have addressed the issue "have shown reluctance to hold that individuals who are 'totally disabled' for [Social Security] purposes are covered by the ADA." *Id.* at 1219. On the other hand, courts have also been generally unwilling to impose a *per se* rule barring plaintiffs who have sought or obtained disability benefits from showing that they could "work with reasonable accommodations under the ADA." *Id.* at 1218. In fact, it appears that no court has adopted an iron-clad *per se* rule. *Id.*

In two recent decisions, the Eleventh Circuit has laid out the broad outlines of its own approach to the problem. *See Talavera,* 129 F.3d at 1220; *Taylor v. Food World,* 133 F.3d 1419 (11th Cir. 1998). In line with the position taken by other courts, the Eleventh Circuit has disapproved of the indiscriminate use of judicial estoppel to defeat the ADA claim of a plaintiff who certified that she was totally disabled in applying for disability benefits. *See Taylor,* 133 F.3d 1423; *Talavera,* 129 F.3d at 1220. Instead of applying estoppel *per se* to such a plaintiff, courts are to consider whether estoppel is warranted based on specific representations in the application for benefits that are in fact inconsistent with being a "qualified individual" under the ADA. *See Talavera,* 129 F.3d at 1220. In light of this approach, the Eleventh Circuit has made it clear that a plaintiff is bound by any specific representations made in seeking benefits. "[A]n ADA plaintiff is estopped from denying the truth of any statements made in her disability application" because "an ADA plaintiff should not be permitted to disavow any statements she made in order to obtain . . . benefits." *Id.*

15

Thus in both *Talavera* and *Taylor* the court declined to estop the plaintiff from going forward with an ADA claim after a highly fact-specific inquiry into the precise representations made in seeking benefits.

The Eleventh Circuit's approach is thus relatively clear in some respects. While estoppel should be applied to specific factual assertions, a mere application for benefits or general assertion of an inability to work will not necessarily estop an ADA plaintiff. What is less clear, however, is whether generalized statements will *ever* be sufficient to support an estoppel argument in this circuit. This is precisely the problem presented here, because the few specific claims advanced by Story in her benefits application, consisting primarily of Dr. Snell's assertions that Story was "not able to work in the plant" and could only work in a job "without chemical fume exposure," *Defendant's Exhibit J*, are almost entirely consistent with her position before this court.

While the Eleventh Circuit has never addressed the issue directly, this court holds that at least under some circumstances a plaintiff's assertion on a benefits application that she is totally disabled is itself sufficient to estop the plaintiff from pursuing an ADA claim. The Eleventh Circuit's rejection of a *per se* rule does not necessarily imply that generalized disability claims are meaningless, nor should it. *Talavera* and *Taylor* are based instead on the premise that, because of the ADA's unique structure, an assertion that a plaintiff is not capable of working under conventional circumstances is not necessarily inconsistent with a claim that the plaintiff is also a "qualified individual" under the ADA. *See Taylor*, 133 F.3d at 1422. For this reason, a more detailed inquiry is required to determine whether, in a particular case, past assertions really are inconsistent with present ones. The court sees

16

no reason why, in some cases, this inquiry might not reveal that even very general assertions from the past are inconsistent with the stance taken in ADA litigation.

An examination of the underpinnings of the Eleventh Circuit's estoppel precedent, both generally and as applied specifically to the ADA, sheds light on the factors which should be considered in making the required case-by-case inquiry. Guidance can also be gleaned from the EEOC's position paper on the subject, which argues against a *per se* rule and provides its investigators with a list of considerations to be used in evaluating the effect of prior representations on disability applications. *See EEOC Enforcement Guidance*, Notice No. 915.002, February 12, 1997, at IV.

While the court in *Talavera* did not give an elaborate recitation of its rationale, it did engage in a thorough review of the analysis performed by other courts to reach similar results, and we can assume that the same sort of analysis led the Eleventh Circuit to its own conclusions. Opponents of a *per se* estoppel rule have advanced a number of arguments in support of their position. Chief among them, however, is the claim that the technical definition of phrases like "totally disabled" under the various disability benefits schemes does not include or account for the possibility of "reasonable accommodation."[8] Thus

---

[8] The court will mention in passing one other argument often advanced by those opposed to the broad application of estoppel. The EEOC, along with a number of courts, have condemned the Hobson's choice forced on the disabled by application of the estoppel principle, which "forc[es] plaintiffs to choose between enforcing their rights under the ADA and seeking immediate, subsistence benefits." *Johnson*, 141 F.3d at 1368; *see, e.g., id.; Swanks*, 116 F.3d at 586. This argument is valid, to a point. Plaintiffs who qualify for *both* disability benefits and ADA relief should certainly be entitled to pursue both. However, where a plaintiff cannot consistently seek both, the court must put the plaintiff to her choice. While the court sympathizes with the extreme difficulty of this choice, its sympathy presents no valid reason to distort the meaning and purpose of the various statutory and contractual benefits schemes. It would be nice to provide interim support for those harmed by discrimination and pursuing a remedy under the ADA or any one of the many other federal anti-discrimination laws, but such support must be provided through some other vehicle. This is not what social security and private disability pension benefits are for. As the SSA itself has observed, "A basic program principle is that a claimant's impairment must be the primary reason for his or her inability to engage in substantial gainful work." S.S.R. 82-61, 1982 WL 31387

17

"[b]ecause of the different definitions of disability under the ADA and under the various policies of disability benefits-providers, an individual may be disabled - - and therefore entitled to disability benefits so long as she is not working - - and still be a qualified individual under the ADA because she can work with reasonable accommodations." *Johnson v. Oregon*, 141 F.3d 1361, 1367 (9th Cir. 1998). This argument has been emphasized in a number of decisions, *see, e.g, Swanks v. Washington Metro. Area Transit Auth.*, 116 F.3d 582 (D.C. Cir. 1997); *see also EEOC Enforcement Guidance*, at II.C.2, and it appears that it played a key role in the Eleventh Circuit's decision in *Talavera*. In *Talavera*, "[the] court determined" that a "certification of total disability on a disability application is not inherently inconsistent with being 'qualified' under the ADA. The court reasoned that the SSA, in determining whether an individual is entitled to disability benefits, *does not take account of the effect of reasonable accommodation.*" *Taylor*, 133 F.3d at 1423 (emphasis added). Thus before applying estoppel, a court must ensure that the legal definitions of the terms used in an application really are inconsistent with the positions required in an ADA suit, and in particular whether the ADA's reasonable accommodations provision creates a linguistic zone of safety for the plaintiff. *See Pena v. Houston Lighting and Power Co.*, 154 F.3d 267 (5th Cir. 1998) (rejecting a *per se* rule but finding estoppel

_____

at *1. Thus factors including a "lack of job openings, and employers' hiring practices are not pertinent to the decision." S.S.R. 82-42, 1982 WL 31388 at *2. "This reflects the intent of Congress that there be a clear distinction between disability benefits and unemployment benefits." S.S.R. 82-61, 1982 WL 31387 at *1. In other words, the social security system is designed to provide benefits *only for those who cannot work*. Private disability pensions serve the same purpose. Those who are in financial straits for other reasons, including "employers' [discriminatory] hiring practices," must seek their remedy elsewhere. Hopefully, potential plaintiffs will be able to obtain other employment or will at least receive support in the form of unemployment or other benefits designed specifically to help those in financial need. They cannot, however, manipulate the disability benefits system to serve purposes other than those for which it was intended. The need for "immediate, subsistence benefits," *Johnson*, 141 F.3d at 1368, grants no license to play fast and loose with the truth.

18

based on a disability pension application because the pension plan covered only employees who were unable to perform their jobs even with accommodation); *see also EEOC Enforcement Guidance*, at IV.

While the relevant decisions have by and large focused on the technical definition of terms, endeavoring to point out as a matter of legal logic the possibility that a totally disabled individual might also be qualified to work under the ADA, the common-sense meaning of the words involved is also important. This is so because the doctrine of estoppel is directed against the "calculated assertion of divergent sworn positions. . . . [T]he rule looks toward cold manipulation and not an unthinking or confused blunder, [and so] has never been applied where plaintiff's assertions were based on fraud, inadvertence of mistake." *Johnson Service Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973). Thus it is important that the plaintiff actually understands what she is signing and saying, because a mere error or misunderstanding is not sufficient to support estoppel. A knowing manipulation of the truth is required. For this reason, it is probably inappropriate to apply estoppel by charging a plaintiff with knowledge of the legal or contractual standards behind a particular bit of language in an application.[9]  Instead the EEOC suggests that its investigators consider factors, including whether any representations made are made in the claimant's own words and whether the employer suggested that the

---

[9] This approach initially appears somewhat inconsistent with the line of argument, already discussed, which claims that because the statement is not technically inconsistent with a later position estoppel should not apply.  The two standards are not really inconsistent, however.  One simply asks whether, within their actual meaning, it is possible for the two positions to be consistent.  If so, courts will not inquire further.  If not, the next question is whether the plaintiff understood what she was saying in the first place.  The plaintiff-friendliness of this dual standard can be explained by the equitable nature of the doctrine, requiring actual misfeasance, and the courts' relative reluctance to apply estoppel.

19

claimant apply, which may bear on the question of whether the claimant really understood what she was saying and doing. *EEOC Enforcement Guidance*, at IV; *see also Pena*, 154 F.3d at 269 (noting that the relevant definition appeared on the application). If the claimant's understanding of what she was saying or signing is not inconsistent with her current position, estoppel should not apply.

The court notes that this test is more readily satisfied in the context of specific factual assertions by the claimant than when the claimant makes required certifications in the language specified by law or contract. A claimant obviously understands what she means when she says "my back hurts so I can't lift anything heavy," but she may not understand what technical language on a form means even though she signs it. This may in part explain courts' ready willingness to hold plaintiffs to past specific allegations, and reluctance to give meaning to more generic assertions of disability. However, even general assertions have a core of meaning which courts can assume everyone understands, and to which they can and should hold plaintiffs. The handling of generic allegations simply requires more care to assure that in a particular case the claimant is held only to what she understood the language to mean, and not what lawyers understand it to mean.

For the same reason, the court should also assess any direct evidence that the plaintiff knew that her assertions were inconsistent or untruthful, and proceeded with them anyway. Proof that the plaintiff "cold[ly] manipulat[ed]" the situation with knowing falsehoods would weigh heavily in favor of estoppel, as this is precisely the sort of behavior against which the estoppel doctrine is directed. *Johnson Service Co.*, 485 F.2d at 175.

20

Having reviewed what it believes are the relevant factors to consider, the court will now turn its attention to their application to this particular case. Critical to this court's analysis is the fact that the plaintiff has not come forward with any proposed job modifications or other accommodations on which to base her ADA claim.[10] She alleges instead that she could perform jobs at GM *without alteration or accommodation* if GM would only place her in the right position.[11] This means that the discrepancies in the various definitions of disability created by the ADA's reasonable accommodations provision do not apply in this case, because plaintiff seeks an ordinary job, not an accommodation. The case is thus distinctly different from *Taylor* and *Talavera*, and indeed is unlike any case the court has come across in its research.

Plaintiff's claim that she can fill regular positions at GM is clearly inconsistent with the definition of "totally disabled" under GM's pension plan, which requires essentially that the disabled employee be unable to work at GM.[12] It is likewise inconsistent with a claim of disability for social security purposes. Plaintiff asserts that she can fill ordinary positions

---

[10]As already noted, it is her burden to do so. *Willis*, 108 F.3d at 283.

[11]The court recognizes that Story's request for a different position technically counts as an accommodation under the ADA. However, she has asked for positions which she claims are normal, open and available jobs at GM. In the court's view, transfer to a different regular job is not the sort of accommodation which opens up a gap between the ADA's definition of disability and that used by disability benefits programs. In this situation the power of the ADA has not been used to create a new job, otherwise unavailable and thus unconsidered by benefits plans. The jobs Story asks for are precisely those which would be taken into account under GM's pension scheme and, in a more general sense, under the social security program. As the discussion below reveals, this means that Story's assertions on her applications are inconsistent with her position here.

[12]The fact that the pension definition of disability focuses on particular jobs with a particular employer, specifically jobs with GM at a particular plant, also answers the EEOC's contention that a claim of disability under some benefits schemes may not be inconsistent with an ADA claim because the ADA looks at the claimant's ability to fill specific job positions while many benefits schemes evaluate only the ability to work generally. *See EEOC Enforcement Guidance*, at I.C.1; *see also id.* at IV (whether the definition of disability under a particular benefits scheme "look[s] at specific positions or general kinds of work" is a factor to consider in assessing the impact of an application under that scheme on an ADA claim).

21

with a major manufacturing company, positions which undoubtedly exist in vast numbers in the national economy.[13] Plaintiff's ability to do these jobs without alterations would negate any claim of disability under the Social Security Act. *See Swanks*, 116 F.3d at 684-585 (discussing the five-step procedure for determining social security disability). The Eleventh Circuit itself has said as much, noting that while "a certification of total disability on a [social security] application" "does not necessarily mean that the applicant cannot perform the essential functions of her job with reasonable accommodation," it *"does mean that the applicant cannot perform [those] essential functions . . . without reasonable accommodation." Talavera*, 129 F.3d at 1220 (emphasis added). As a legal matter, then, plaintiff's assertions on her disability benefit applications are entirely inconsistent with her claims before this court.

The other factors discussed above also weigh in favor of estoppel. First, the language used in Ms. Story's application is fairly clear and its meaning and application to her case easily understandable. She indicated at various times that she was "unable to work," "totally disabled," and "wholly unable to work." *Defendant's Exhibits J, K.* Particularly in the context of an application for "Total And Permanent Disability Benefits," anyone would have understood these words to mean at least that the plaintiff could no longer work at GM. Ms. Story's deposition testimony reveals no doubts on this score. It is clear that she understood what she was signing and knew that what she was saying wasn't true. It appears to this court that she knowingly lied to "keep getting [her] check."

---

[13]For example, the computer-oriented clerical positions plaintiff seeks exist in virtually every company of any size.

22

*Plaintiff's Exhibit 2 (August 4 Depo. of E. Story* at 87). While her motivations are understandable, this court cannot allow her to profit from her misrepresentations. This is precisely the sort of self-serving manipulation of the truth which the estoppel doctrine was designed to combat. Having chosen to formulate her own version of the truth, Ms. Story is now stuck with it.

"[E]stoppel is an equitable doctrine, invoked by a court at its own discretion, and driven by the specific facts of a case." *Johnson,* 141 F.3d 1368. For the reasons set out above, this court holds that under the particular facts presented here Ms. Story is estopped from arguing that she could fill a position at GM without accommodation. As she has made no claim for a job modification or other accommodation, she is therefore not a "qualified individual" under the ADA and summary judgment for the defendant is due to be granted.

## B. Defendants' Remaining Arguments.

GM also contends that summary judgment should be granted because Ms. Story cannot prove that GM could reasonably be required to place her in one of the jobs she claims she could do. GM argues that no positions were open in these jobs, and that the seniority provisions of the collective bargaining agreement prevented GM from displacing employees with more seniority in order to provide a spot for Ms. Story. The court assumes that GM is correct that as a legal matter a "reasonable accommodation" would not require GM to create a new position, give Story a position which is not vacant, or violate the terms of its agreement with the UAW. Even so, however, the court concludes that GM has not carried its initial burden of showing that Story could not prove that there was a vacancy in

23

a job which she could do and which she could hold consistently with GM's collective bargaining agreement.[14]

As noted above, the plaintiff has set out with fair specificity the jobs she feels she could do, and has provided some fairly compelling evidence that she could in fact perform these jobs despite her medical condition. Ms. Story wants "to be placed in the yard crew, car program, fab shop, personnel department or working on computers," *Opponent's Initial Submission in Response to Exhibit "D" of the Court's Order*, at 35, and it appears that she would be fully capable of working in any of these positions. GM has presented evidence that there are no permanent job openings on the grounds crew or car program during the time that Story was looking for a position. *Defendants' Exhibit R.* However, GM for some reason has ignored the other positions sought by Story in its analysis, and has not directed this court's attention to any evidence indicating that these jobs did not exist as permanent positions or that there were no openings in those positions which did exist. Nor has GM presented evidence establishing that, if such positions existed, there is no way that

---

[14]The Eleventh Circuit's pronouncement that an ADA plaintiff bears the "burden of production" on reasonable accommodations, *see Willis*, 108 F.3d at 283, may somewhat alter the usual summary judgment allocation of the burdens of proof and production. After reviewing *Willis*, this court suspects that a defendant need not take up its usual summary judgment burden on the reasonable accommodation issue unless and until the plaintiff bears its burden of production to "describe" the accommodation sought. *Id.* at 284. As a practical matter, placing the burden of coming forward on the plaintiff would be meaningless if a defendant on summary judgment were required to discuss and negate all possible accommodations. However, once the plaintiff has pointed out the accommodations she seeks, the question becomes an ordinary one of proof. The plaintiff must bear the burden of proving that the accommodation is reasonable, *id.*, which when a new position is sought means that the job is vacant, *id.* at 284, and probably also requires a showing that the job can be filled consistently with any union agreement. However, while plaintiff bears the ultimate burden of proof on these questions, under the familiar summary judgment rules set out above the defendant bears the initial burden of showing that plaintiff cannot bear her burden. For the reasons discussed, the court feels that the defendant has not made this showing here.

24

Story could have been placed into one of them consistent with GM's agreement with the union.[15]

As to the fab shop and computer jobs, GM's sole argument is that Story has not presented any evidence showing that regular job vacancies existed in these positions and that she could obtain them consistently with the union agreement. Admittedly, Story's evidence on summary judgment is weak and her arguments somewhat difficult to comprehend. As far as the court can tell, the only evidence Story has presented is her own hearsay affidavit suggesting that there is an employee working in personnel with less seniority than she has, *Plaintiff"s Exhibit 7,* and evidence from one of GM's managers which establishes that over the years employees have come and gone from front office computer jobs. *Plaintiff's Exhibit 5 (Depo. of Harry Fuller* at 116, 118). While a reasonable factfinder might be able to infer from this evidence that there were vacancies in these positions at various times, and that Story might have had enough seniority to get one, this evidence is not particularly specific or compelling.

Unfortunately for GM, Story did not have to present *any* evidence. If she had made *no reply at all* to defendant's motion other than to name the jobs she wanted, GM would not be entitled to summary judgment without an affirmative showing that Story could not

[15]While the mechanics of ¶ 72 of the collective bargaining agreement are not entirely clear from its bare language, and while neither party has presented evidence establishing how the provision was applied in practice, the court presumes that there was some way for disabled employees to obtain positions at GM under the agreement. For example, disabled employees might have been allowed at the least to bid on open jobs under the regular seniority system. If there was such a union-approved mechanism for Story to obtain a position, as the court suspects, GM would have to bear its burden of showing that Story could not have obtained one of these jobs in this way. If there was not any way for a disabled employee to obtain a permanent position, so that the employee was entirely at the mercy of the union, the court wonders whether the provision itself might not violate the ADA. In any event, it would be GM's burden on summary judgment to show that clause worked this way and that Story could not genuinely dispute its meaning and operation. GM has not done so.

25

prove that one of these jobs was open and available to her under the terms of the union agreement. "[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial." *Clark v. Coats and Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). GM has not even attempted to make an affirmative showing as to the jobs in the "fab shop, personnel department or working on computers," so summary judgment based on job availability is not proper.

**IV.    Conclusion.**

Defendant's motion for summary judgment will be granted on the basis of estoppel. A separate order, consistent with this opinion, will be entered.

Done, this _____7th_____ of December, 1998.

EDWIN NELSON
UNITED STATES DISTRICT JUDGE

26